NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| M.S. and D.S., Individually, and as Guardians *ad litem of* N.S., | |
| *Plaintiffs,* | Civil No.: 18-13029 (KSH) (CLW) |
| v. | |
| RANDOLPH BOARD OF EDUCATION, | **Opinion** |
| *Defendant.* | |

**Katharine S. Hayden, U.S.D.J.**

## I. Introduction

Plaintiffs M.S. and D.S. bring this action individually and on behalf of their son, N.S., against defendant Randolph Board of Education ("the District") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, as an appeal from the final administrative decision of Administrative Law Judge Gail M. Cookson, issued on July 16, 2018. *See M.S. and D.S. ex rel. N.S. v. Randolph Twp. Bd. of Educ.*, OAL No. EDS 4386-17 (July 16, 2018) (hereinafter "ALJ Op.").[1] Plaintiffs allege that the District denied N.S. a Free and Appropriate Public Education ("FAPE") and seek

---

[1] N.S. turned 18 during the administrative proceeding. A power of attorney was submitted to allow plaintiffs to continue on his behalf.

reimbursement of the costs associated with their unilateral placement of N.S. at Waypoint Academy, a residential treatment facility for youths with anxiety in Huntsville, Utah.

Currently before the Court is plaintiffs' motion for summary judgment asking it to reverse the ALJ's decision. (D.E. 12.) The Court held oral argument on the motion on July 15, 2019, and it is now ripe for a decision. As set forth below, the motion is denied, and judgment is entered in favor of the District.

## II. Background

### A. N.S.'s Anxiety and School Refusal

The following is taken from plaintiffs' statement of material facts, the District's response, and the administrative record below. N.S. was born on November 6, 1999, and has a twin sister. (P-100 ("D.S. Cert.") ¶ 2.) In 2006, he was evaluated by the Morris Township School District, which he was attending at the time. (P-55.) The evaluation determined that he was eligible for speech and language services for a disarticulation issue and moderate fluency disorder (a stutter). (D.S. Cert. ¶ 4.) N.S. received an IEP for speech and language services in 2007. (P-56.) When N.S. moved to Randolph, New Jersey in 2007, the speech services were continued by the District. (P-57.)

The District offered N.S. speech therapy from second through tenth grade under Speech-Only IEPs. (P-57; P-58; P-59; P-61; P-63; P-64; P-70; P-71.) On May 24, 2016,

at the end of N.S.'s tenth-grade year, plaintiffs asked the District to stop providing N.S. speech and language services. (P-78)

Previously, in May 2012, when N.S. was is sixth grade, Eric J. Bartky, M.D. diagnosed him with anxiety disorder. (D.E. 12-1 ("Plaintiffs' SOF") ¶ 3.) An annual IEP meeting about N.S.'s ongoing speech and language services was held in October of his seventh-grade year at which D.S., N.S.'s mother, voiced concerns about his anxiety. (P-64.) The next month plaintiffs shared Bartky's report and diagnosis of anxiety disorder with the District and requested a 504 Plan for N.S.[2] (Plaintiffs' SOF ¶ 7.)

On November 21, 2012, the District prepared a 504 Plan that indicated that N.S.'s disability is anxiety, that it is trigged by his school performance, and that he was exhibiting school phobia. (J-1.) The 504 Plan afforded N.S. extra time to complete long-term assignments and allowed him to participate in "Homework Club." (*Id.*) Teachers also provided N.S. additional time to complete his homework, although his original 504 Plan did not include it as a specific accommodation. (Plaintiffs' SOF ¶ 8.) In May 2013, D.S. asked to meet with N.S.'s teachers to discuss possible changes because she believed his anxiety was not improving with the accommodations that were

---

[2] "A Section 504 Plan specifies the accommodations and modifications the school district will offer to ensure that a disabled student receives an appropriate education." *S.M. ex rel. G.M. v. Sch. Dist. of Upper Dublin*, No. 10-4038, 2011 WL 3678325, at *1 (E.D. Pa. Aug. 18, 2011).

in place.  (P-2 at 73.)  The 504 Plan was reviewed and updated to continue the accommodations for N.S.'s anxiety.  (*See, e.g.*, J-3; J-4; J-6; J-9; J-10; J-18; J-23; J-29; J-31.)

At the beginning of N.S.'s eighth-grade year, D.S. e-mailed N.S.'s teachers about his anxiety.  (*See, e.g.*, P-3 at 90-91.)  During an annual IEP meeting in October 2013, D.S. again raised her concerns about his anxiety.  (P-70 at 518.)  During eighth grade, N.S.'s 504 Plan added a new accommodation for a two-day extension for long-term assignments and projects if required.  (J-3.)

N.S. exhibited school refusal while he was in eighth grade, and D.S. advised N.S.'s guidance counselor the she was having difficulty getting N.S. to attend school.  (D.S. Cert. ¶ 32; P-3 at 114.)  Bartky continued to see N.S. for medication management, but he had a different therapist, Marc Gironda.  (P-53; D.S. Cert. ¶ 34.)  N.S. was not receptive to therapy during the school year (D.S. Cert. ¶ 34), and he required support at home to complete eighth grade (Plaintiffs' SOF ¶ 15).

When N.S. began ninth grade in September 2014, at plaintiffs' request, the District developed a 504 Plan with supports similar to those in N.S.'s prior plans.  (Plaintiffs' SOF ¶ 16; P-4 at 127-28)

On January 9, 2015, N.S. suffered a concussion while playing hockey at school.  (*Id.* ¶ 17.)  On January 15, 2015, plaintiffs gave the District an academic excuse letter from the Concussion Center at Overlook Hospital stating N.S. required home instruction, which he received.  (P-8.)  In April 2015, N.S. returned to Randolph High

School.  (Plaintiffs' SOF ¶ 17.)   The District provided accommodations that were recommended by N.S.'s treating physician.  (*Id.*)  N.S. completed his ninth-grade school year.  (*See generally* J-12)

In June 2015, D.S. met with the District for N.S.'s IEP annual review and again she expressed concerns about his anxiety.  (Plaintiffs' SOF ¶ 18.)  For tenth grade, the District recommended that N.S. take B level classes in History and English, but plaintiffs waived him into higher A level classes.  (D.S. Cert. ¶ 58; P-4 at 174-75.)

At the start of his tenth-grade year, N.S.'s anxiety re-emerged.  (Plaintiffs' SOF ¶ 19.)  On October 15, 2015, plaintiffs met with the Intervention and Referral Services team to discuss ways to help N.S. work through his school-related anxiety.  (*Id.*)

On October 18, 2015, Bartky recommended home instruction for N.S., and on October 22, 2015, he sent an e-mail to the District's Guidance Department recommending psychoeducational testing of N.S.  (*Id.* ¶ 20.)  The Guidance Department did not respond to the request for testing.  (*Id.*)

Home instruction started at the end of October 2015, but N.S. refused to participate.  (*Id.* ¶ 21.)   As a result, plaintiffs placed him at Mountain Valley Treatment Center ("Mountain Valley"), a residential treatment center for adolescents with anxiety located in Pike, New Hampshire.  (*Id.* ¶ 22.)  N.S. attended Mountain Valley from November 15, 2015, through February 15, 2016.  (*Id.*)  Although Mountain Valley was not an educational institution, N.S. received some academic services in three subjects provided by Knower Academics, an outside agency.  (D.S. Cert. ¶ 73.)

While N.S. was at Mountain Valley, Kevin O'Keefe, Psy. D., completed a psychological assessment of N.S. (Plaintiffs' SOF ¶ 23.) N.S. told O'Keefe that his parents wanted him to remain home from school to help him find a place to help with his anxiety, and that he was working on his anger toward his family and the program at Mountain Valley had been helpful. (J-16 at 4.)

O'Keefe administered the Wechsler Adult Intelligence Scale-IV and found that N.S. had a Verbal Comprehension Index of 118, a Perceptual Reasoning Index of 117, a Working Memory Index of 102, a Processing Speed Index of 100, and a Full-Scale IQ of 113. (Plaintiffs' SOF ¶ 24; J-16 at 5-6.) The results of the assessment placed N.S.'s cognitive function in the high average range. (J-16 at 5-6.) O'Keefe also assessed N.S.'s academic achievement and determined that he was functioning in the average to above average range in all areas compared to students of his age and grade. (*Id.* at 7-8.) O'Keefe diagnosed N.S. with generalized anxiety disorder and persistent depressive disorder. (*Id.* at 13.) O'Keefe recommended that N.S. would benefit from a "structured academic environment with strong therapeutic support, such as a therapeutic boarding school" after his discharge from Mountain Valley. (*Id.*) He also opined that N.S. would benefit from individual, group, and family therapy. (*Id.*)

When N.S. was discharged, the Mountain Valley professionals who treated him recommended that he receive home instruction for the first week and then begin attending school partial days supplemented with home instruction until he caught up. (Plaintiffs' SOF ¶ 27; P-14; P-15.) They suggested that N.S. resume full-time attendance

at school as of March 22, 2016. (J-17; P-16.) The District implemented Mountain Valley's recommendations for N.S.'s transition back to school. (R-1 ("Iosso Direct") ¶¶ 20, 22.)

With the help of the Mountain Valley transition plan, N.S. returned to school full-time, but his pattern of school refusal and anxiety returned. (Plaintiffs' SOF ¶ 27.) At the end of March 2016, he began to see a new therapist, Michael Bodtmann, LCSW. (D.S. Cert. ¶ 81.) N.S. resisted therapy, and Bodtmann told plaintiffs that it was futile for N.S. to continue treatment because he refused to follow any recommendations. (*Id.*) N.S. completed the tenth grade at Randolph High School. (J-19.)

Academically, during seventh through tenth grades, N.S.'s lowest final grade was a C+ that he received in tenth grade Accelerated English. (*Id.*) All of his other grades were A's or B's. (J-2; J-7; J-12; J-19; R-12.) N.S. also demonstrated superior performance on state and local standardized tests. (J-13; J-34.) In eleventh grade, N.S. was recommended for B level English. (Plaintiffs' SOF ¶ 28; D.S. Cert. ¶ 84; P-5 at 237.) N.S., however, insisted on Accelerated English, threatening not to attend school if his class level was lowered. (Plaintiffs' SOF ¶ 28; D.S. Cert. ¶ 84.) Plaintiffs waived N.S. into the A level class. (Plaintiffs' SOF ¶ 28; D.S. Cert. ¶ 84.)

N.S. started eleventh grade in the fall of 2016, and the District continued his 504 Plan with supports and accommodation for extensions. (Plaintiffs' SOF ¶ 28.) On September 20, 2016, plaintiffs asked that N.S. be evaluated for special education and related services. (Plaintiffs' SOF ¶ 29.) On September 30, 2016, the Child Study Team

("CST") conducted an evaluation planning meeting at which plaintiffs agreed to psychological and social assessments. (Plaintiffs' SOF ¶ 30.) The District did not request a psychiatric assessment. (*Id.*) In addition, the District referred N.S. to Linda McGovern, a Clinical Supervisor for the District through the Sage Day School. (*Id.* ¶ 32.) Plaintiffs initially accepted the referral. (*Id.*)

On October 17, 2016, McGovern had her first meeting with N.S. to start therapeutic support for the issues reported by plaintiffs. (R-5 ("McGovern Direct") ¶ 15.) As he had with prior therapists, N.S. resisted therapy with her. (*Id.*) N.S. also refused the offer of his treating therapist at the time, Josh Glawe, LCSW, to assist him in attending school or coming downstairs for home instruction. (*Id.* ¶ 70.) Nor did plaintiffs take advantage of that offer. (*Id.*)

The District proceeded with the social and psychological assessments of N.S. On October 26, 2016, Jane McGarry, LCSW, conducted the social assessment of N.S. (J-26.) It consisted of an interview with plaintiffs and a review of N.S.'s records. (*Id.*)

On October 31, 2016, Maria Renken, the school psychologist, conducted the psychological assessment. (J-25.) She interviewed N.S. and observed him in the classroom. (*Id.* at 144.) Renken witnessed N.S. attending to instruction, working cooperatively with peers during a group activity, and expressing his opinions without hesitation. (*Id.* at 148.) Renken indicated that N.S.'s teachers were concerned about his absenteeism, which was having negative consequences on his performance. (*Id.* at 156.) In the assessment, Renken concluded that:

Overall, [N.S.] presents as a student who performs well on in-class assignments, but struggles with attendance and homework completion. By report, [N.S.'s] anxiety negatively impacts his homework completion. In the classroom, his teachers report some difficulty with adaptive skills, most notably [N.S.'s] ability to interact with his peers. [N.S.] reports typical interests and demonstrates a strength in grasping new concepts, specifically in math-based subjects and areas of his interest (e.g., computer graphics and design).

(*Id.*)

In November 2016, N.S. turned 17 and stopped attending school. (Plaintiffs' SOF ¶ 35; Iosso Direct ¶¶ 31, 51.) Because of his age, the District could not compel his attendance through truancy mechanisms. (Iosso Direct ¶ 51.)

Up until then, N.S. did not have a history of extensive absences. In sixth grade, N.S. was absent from school 11 days and was tardy five times. (R-12.) In seventh grade, N.S. was absent 10 days and was tardy once. (J-2.) In eighth grade, he missed eight days of school and was tardy four times. (J-7.) Other than the period he was on home instruction for his concussion in ninth grade, N.S. was absent seven days and tardy four times. (J-12.) In tenth grade, other than the period he was at Mountain Valley, N.S. was absent 12.5 days and was tardy six times. (J-19.) During the summers before seventh, eighth, ninth, and tenth grade, N.S. went to summer camp in New York where he had no problems with his anxiety. (D.S. Cert. ¶¶ 13, 26, 38, 62.)

On December 6, 2016, plaintiffs provided the District with a psychiatric evaluation of N.S. conducted by Charles Martinson, J.D., M.D., along with a request for home instruction. (Plaintiffs' SOF ¶ 32; D.S. Cert. ¶¶ 98-99; P-22.) The District

denied the request for home instruction on the ground that it had no information indicating that N.S. was medically unable to attend school. (D.S. Cert. ¶¶ 97, 99.)

Martinson testified before the ALJ that D.S told him that she wanted a residential placement for N.S. to alleviate problems at home, which included N.S.'s feeling that he was in competition with his siblings. (9/13/17 Tr. at 153:24-155:2.) This was information that Martinson did not include in his report that plaintiffs gave to the District. (*Id.* at 155:3-4.)

During this period, plaintiffs hired Pam Bard, an educational consultant, to explore residential placements for N.S. (D.S. Cert. ¶ 116.) In December 2016, Bard referred plaintiffs to Waypoint Academy ("Waypoint") in Huntsville, Utah. (*Id.*)

On December 16, 2016, after receiving Martinson's evaluation, the CST concluded that N.S. was not eligible for special education and related services because he did not require specially designed instruction. (D.S. Cert. ¶ 99; P-26; P-89.) On December 19, 2016, after an eligibility meeting, Martinson sent a letter to the District stating that N.S. could not attend school because of symptoms of the medical conditions of generalized anxiety disorder and specific phobia. (J-28.) Relying on the letter, the school physician recommended that N.S. receive home instruction. (Iosso Direct ¶ 34.)

In February 2017, McGovern proposed a schedule to return N.S. to school. (McGovern Direct ¶¶ 36-39.) Although he seemed willing at first, N.S. ultimately refused all school options, whether part-time or full-time, including an Option 2

independent study program offered by the District pursuant to which he could have fulfilled his graduation requirements. (Iosso Direct ¶¶ 48-49; McGovern Direct ¶ 40.) Plaintiffs supported N.S.'s decisions to reject those options. (Iosso Direct ¶ 47; McGovern Direct ¶ 40.)

On or about March 14, 2017, plaintiffs shared with the District a psychological evaluation of N.S. conducted by Daniel DaSilva, Ph. D. (Plaintiffs' SOF ¶ 32; P-32; P-34.) DaSilva opined that N.S. should be classified as emotionally disturbed and placed in a therapeutic residential school. (P-32 at 364.)

Around the same time, the District advised plaintiffs that McGovern would only continue to provide services if N.S. participated in home sessions and asked for an updated prescription for home instruction. (D.S. Cert. ¶ 111; P-35.) On March 21, 2017, the District received an updated prescription from Dr. Lee Suckno, N.S.'s psychiatrist at the time. (D.S. Cert. ¶ 111; P-38.)

In March 2017, N.S. was accepted at Waypoint, and plaintiffs informed the District of their intent to place him there effective May 22, 2017. (Plaintiffs' SOF ¶ 42; D.S. Cert. ¶ 117.) Plaintiffs signed a contract with Waypoint on April 27, 2017. (D.S. Cert. ¶ 118; P-40; P-41.)

Other than one session during the month of April 2017, N.S. did not participate in home instruction (D.S. Cert. ¶ 115) and he did not return to Randolph High School (Iosso Direct ¶ 42). Instead, N.S. started attending Waypoint. (*See* D.S. Cert. ¶¶ 118-19.)

11

## B.    Plaintiffs' Due Process Petition

On February 23, 2017, before N.S. was accepted at Waypoint, plaintiffs submitted a request on his behalf for due process (the "Due Process Petition") to the New Jersey Office of Special Education on the issue of whether the District had failed to properly evaluate and classify N.S., and as a result failed to provide a FAPE. (Plaintiffs' SOF ¶ 39.)

A hearing was held before the ALJ on August 25, September 11, September 13, October 10, and November 14, 2017.  (*Id.* ¶ 43.)  At the hearing, D.S., Martinson, and DaSilva testified for plaintiffs.  (ALJ Op. at 58.)  Martinson was qualified as an expert in child and adolescent psychology (*id.* at 29), and DaSilva was qualified as expert in pediatric neuropsychology and neuropsychological assessments, but not in the proffered area of developing IEPs (*id.* at 35). The District offered the testimony of Deborah Iosso ("Iosso"), the principal of the District's high school and overseer of its 504 Committee, as well as Renken, McGovern, and Walter Curioni ("Curioni"), the District's Director of Special Services.  (*Id.* at 58.)  Renken was qualified as an expert in psychological assessments and eligibility for special education (*id.* at 7), and Curioni was qualified as an expert in eligibility and programming for special education (*id.* at 15).

On July 16, 2018, the ALJ issued a decision denying plaintiffs' request for reimbursement of N.S.'s placement at Waypoint, finding that the District "met its burden of proof that the 504 Plan proposed by [the District] for the 2016-2017 school year was appropriate to address N.S.'s medical condition of Generalized Anxiety

Disorder." (*Id.* at 56.) On August 21, 2018, plaintiffs filed this action appealing the ALJ's decision. (D.E. 1.)

## III. Discussion

### A. The IDEA and Section 504

The IDEA conditions a state's receipt of federal education funding on its "mak[ing] available a free and appropriate public education to all children with disabilities residing within [its] borders." *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 556 (3d Cir. 2010) (citing 20 U.S.C. § 1412(a)(1)). "[A] FAPE is defined as 'special education and related services that (A) have been provided at public expense . . . without charge; (B) meet the standards of the State educational agency; (C) include an appropriate . . . education in the State involved; and (D) are provided in conformity with the [IEP]." *R.K. & D.K. v. Clifton Bd. of Educ.*, No. 11-6231, 2013 WL 12089496, at *4 (D.N.J. Mar. 28, 2013) (Hayden J.) (alterations in original) (quoting 20 U.S.C. § 1401(8)), *aff'd*, *R.K. v. Clifton Bd. of Educ.*, 587 F. App'x 17 (3d Cir. 2014).

"School districts have a continuing obligation under the IDEA and § 504 [of the Rehabilitation Act of 1973]—called 'Child Find'—to identify and evaluate all students who are *reasonably suspected* of having a disability under the statutes." *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 249 (3d Cir. 2012) (emphasis in original) (citation and internal quotation marks omitted). That obligation requires school districts to "identif[y] and evaluate[]" "children who are suspected of having a qualifying disability" "within a reasonable time after school officials are on notice of behavior that is likely to indicate

13

a disability." *W.B. v. Matula*, 67 F.3d 484, 501 (3d Cir. 1995), *abrogated on other grounds*, *A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791 (3d Cir. 2007). The Child Find obligation is an affirmative duty, and therefore a public school "must do more than wait for an eligible disabled student to contact it." *Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057, 1066 (D.N.J. 2011) (Bumb, J.). When a school district violates its Child Find obligation by failing to identify a student with a disability, "and provides no specialized instruction to the student to meet the unique needs of his/her disability, the student has been denied a FAPE." *Lauren G. ex rel. Scott G. v. W. Chester Area Sch. Dist.*, 906 F. Supp. 2d 375, 391 (E.D. Pa. 2012) (citing *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 238–39 (2009)).

Significantly and critically, Section 504 defines disability far more broadly than the IDEA. *Wellman v. Butler Area Sch. Dist.*, 877 F.3d 125, 128 n.5 (3d Cir. 2017). Therefore, "some students covered by Section 504 are not covered under the IDEA." *Id.* (citation and internal quotation marks omitted).

Specifically, an "individual with a disability" under Section 504 has (i) "a physical or mental impairment that substantially limits one or more major life activities of such individual," (ii) "a record of such an impairment," and is (iii) "regarded as having such an impairment." 42 U.S.C. § 12102(1).

By contrast, the IDEA defines a "child with a disability" more narrowly to include individuals "with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness),

serious emotional disturbance . . . , orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities." 20 U.S.C. § 1401(3)(A).

## B. <u>Standard of Review</u>

Summary judgment is appropriate if the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to demonstrate "that the evidentiary record presents no genuine issue of material fact." *Id.* If the moving party carries its burden, the nonmoving party "must establish that there is a genuine issue of material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-586 (1986). On a motion for summary judgment, a court construes all evidence in a light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

In IDEA appeals, the reviewing court is obliged "to conduct a modified de novo review," giving "due weight" to the findings of the ALJ. *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003) (citation and internal quotation marks omitted). Under this standard, the ALJ's factual findings "are to be considered prima facie correct." *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (citation and internal quotation marks omitted).

As to credibility determinations, the district court must accept them "'unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion.'"

*Shore Reg'l High Sch.*, 381 F.3d at 199 (quoting *Carlisle Area Sch. v. Scott P. By & Through Bess P.*, 62 F.3d 520, 529 (3d Cir. 1995)).  "[T]he word 'justify' demands essentially the same standard of review given to a trial court's findings of fact by a federal appellate court." *Id.* (citing *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985)).  When there is no new evidence presented to the district court, the motion for summary judgment becomes "'the procedural vehicle for asking the judge to decide the case on the basis of the administrative record.'" *M.A. ex rel. G.A. v. Voorhees Twp. Bd. of Educ.*, 202 F. Supp. 2d 345, 359 (D.N.J. 2002) (Simandle, J.) (quoting *Heather S. v. Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997)), *aff'd*, 65 F. App'x 404 (3d Cir. 2003).  Here, the Court's review is entirely based upon the administrative record.[3]

### C.    None of Plaintiffs' Arguments Is Barred for the Reasons Cited by the District

As an initial matter, the District contends that certain arguments advanced by plaintiffs are barred by the IDEA's two-year statute of limitations or because they were not raised during the administrative proceeding or in the Due Process Petition.  The fundamental flaw with the District's position is that it improperly attempts to construe arguments and evidence as "claims."

---

[3] Citing *N.G. v. Northern Valley Regional High School Board of Education*, No. 15-4419, 2017 WL 5515913 (D.N.J. Mar. 31, 2017) (Hayden, J.), plaintiffs assert that where, as here, the ALJ's practice allows for the use of pre-filed direct testimony, the ALJ's factual findings are entitled to less weight.  That decision made no such conclusion.  While it expressed reservations about the practice, it remanded the matter not because of the use of pre-filed direct testimony, but because the ALJ "skirted the guidance" of the Third Circuit.  *Id.* at *6.

First, the District contends that the IDEA's two-year statute of limitations bars plaintiffs "claims" regarding (i) purported Child Find violations dating back to 2011 when N.S. was in sixth grade, (ii) teasing of N.S. in middle school from September 2011 to June 2014, (iii) referral of N.S. to the CST by Bartky, and (iv) allegations that N.S.'s 504 Plan denied him a FAPE under Section 504.[4]  Plaintiffs respond that, while the IDEA's statute of limitation would bar any claim they could assert which they had notice of before February 23, 2015 (two years before they filed the Due Process Petition), it does not preclude them from offering evidence and argument that is relevant to their claim that the District must reimburse them for N.S.'s placement at Waypoint because it denied him a FAPE.

In essence, the District's statute of limitations argument seeks to prevent plaintiffs from introducing any evidence from before February 23, 2015.  A statute of limitations, however, is a defense and not a rule of evidence.  *See Black Law Enf't Officers Ass'n v. City of Akron*, 824 F.2d 475, 482–83 (6th Cir. 1987) ("The function of a statute of limitations is to bar stale claims."); *United States v. Ashdown*, 509 F.2d 793, 798 (5th

---

[4] New Jersey's statute of limitations for a request for a due process hearing is two years from "the date the party knew or should have known about the alleged action that forms the basis for the due process petition."  N.J.A.C. 6A:14-2.7(a)(1).  The Third Circuit explained in examining the IDEA's federal statute of limitation, which mirrors New Jersey's, *compare* 20 U.S.C. § 1415(f)(3)(C), *with* N.J.A.C. 6A:14-2.7(a)(1), that the IDEA's statute of limitations "begins to run [on] the date the parents knew or should have known of the basis for the claim," *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 613 (3d Cir. 2015) (citation and internal quotation marks omitted).

Cir. 1975) ("The statute of limitations is a defense to prosecution, not a rule of evidence."). Accordingly, a statute of limitations will not preclude the introduction of evidence that predates the start of the limitations period if it is relevant to events that give rise to a timely claim. *See Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992) (explaining that a statute of limitations does not preclude the introduction of evidence from before the commencement of the statute of limitations that is relevant to events during that period); *Hankin Family P'ship v. Upper Merion Twp.*, No. 01-1622, 2012 WL 43610, at *10 (E.D. Pa. Jan. 6, 2012) ("'A statute of limitations does not operate to bar the introduction of evidence that predates the commencement of the limitations period but that is relevant to events during the period.'" (quoting *Fitzgerald v. Henderson*, 251 F.3d 345, 365 (2d Cir. 2001)). Thus the Court may consider evidence introduced by plaintiffs during the administrative proceeding that predates February 23, 2015.

The District also maintains that plaintiffs are precluded from making certain arguments because they were not raised below.[5] The Court has thoroughly reviewed

---

[5] These arguments include that (1) N.S. was not found eligible for special education and related services because Curioni was trying to decrease the number of classified in-district students; (2) the psychiatric evaluation completed by Dr. Gerald Meyeroff, M.D., at the District's request (J-35), supports plaintiffs' positions; (3) the ALJ inappropriately considered the Option 2 program in her decision; (4) the ALJ erred by relying on Renken's testimony in determining the District did not fail its Child Find obligations or inappropriately decline to classify N.S.; and (5) the ALJ afforded Renken's testimony too much weight.

the administrative record and finds that the points plaintiffs advance here were raised during the administrative hearing or represent arguments that could not have been made until now because they concern alleged deficiencies in the ALJ's decision.

In short, the Court finds that none of plaintiffs' arguments is barred by the defenses raised by the District.

### D. The School District Did Not Fail Its Child Find Obligations

Because N.S. was already identified as a child with an emotional disability (anxiety) for which he was provided accommodations pursuant to a Section 504 plan, at issue in his appeal is whether he should have been identified as disabled and eligible for a FAPE with an IEP under the IDEA. New Jersey's implementation of the IDEA sets forth a three-part test to determine whether a student is "eligible for special education services": (i) the student has one of 14 enumerated disabilities, one of which is emotionally disturbed; (ii) "the disability adversely affects the student's educational performance"; and (iii) "the student is in need of special education and related services." N.J.A.C. 6A:14-3.5(c). All three prongs must be satisfied for a student to be eligible for services under the IDEA. Plaintiffs take issue with the ALJ's application of the second and third prongs of the test.[6]

---

[6] Plaintiffs contend in their notice of motion that the ALJ also erred by finding N.S. did not meet the eligibility criteria to be classified as emotionally disturbed. (D.E. 12-3 at 2.) They did not address this issue in their moving brief. That argument is therefore waived. *See Eagle Sys., Inc. v. Asaro-Angelo*, No. 18-1144, 2019 WL 3459088, at *4 (D.N.J. July 31, 2019) (Shipp, J.) (refusing to entertain plaintiff's new arguments that were not raised in its moving papers); *Mudey v. United States*, No. 09-1669, 2011 WL 2936781, at

1. **The ALJ Did Not Place Undue Weight on N.S.'s Academic Achievements in Finding that his Anxiety Did Not Adversely Affect his Educational Performance**

With respect to the second factor in N.J.A.C. 6A:14-3.5(c), plaintiffs argue that the ALJ placed too much weight on N.S.'s good grades and standardized test scores. According to plaintiffs, the ALJ "substitute[d] 'academics' for the statutorily broad definition of 'education.'" (D.E. 12-4 ("Moving Br.") at 7.) In doing so, plaintiffs maintain that the ALJ failed to consider how N.S.'s anxiety affected his ability to access his education insofar as they claim it prevented him from attending school or participating in home instruction.

The ALJ determined that N.S.'s anxiety did not adversely affect his educational performance because N.S. received good grades and did not have "consistent attendance problems." (ALJ Op. at 54-55.) To be sure, as plaintiffs are quick to note, some courts have recognized that a student's continued receipt of good grades is not conclusive on whether the student's disability affected their ability to access their education. *See, e.g.*, *C.B. ex rel. Z.G. v. Dep't of Educ. of City of New York*, 322 F. App'x 20, 22 (2d Cir. 2009) (explaining that "continuity of [the student's] successful performance"

---

*1 (D.N.J. July 19, 2011) (Chesler, J.) ("[T]his Court will not accept arguments offered for the first time in a reply brief, as they were not properly asserted in the opening brief and the opposing party has not had the opportunity to respond to them."). In any event, even if the ALJ should have found that N.S. is emotionally disturbed, this issue is moot because, as discussed below, the ALJ appropriately determined that his anxiety did not affect his educational performance and that he did not need specially designed instruction.

was one factor to consider in analyzing whether a student's disability affected their educational performance); *M.M. v. New York City Dep't of Educ.*, 26 F. Supp. 3d 249, 256 (S.D.N.Y. 2014) ("A students' continued receipt of good grades *may* constitute evidence indicating that the students' performance in school was not adversely affected by their emotional problems, but it is not necessarily conclusively."). Generally, however, when students' academics do not decline, as is the case here, that consistency is usually found to signal that their disability does not adversely affect their educational performance, including their ability to access their education. *See, e.g., Mr. N.C. v. Bedford Cent. Sch. Dist.*, 300 F. App'x 11, 13 (2d Cir. 2008) (finding that, even assuming the student was emotionally disturbed, that his disability still did not affect his educational performance because his GPA only declined by nine points during the relevant time period); *Lincoln-Sudbury Reg'l Sch. Dist. v. W.*, No. 16-10724, 2018 WL 563147, at *20 (D. Mass. Jan. 25, 2018) ("[B]ecause Wallis's grades declined only slightly between her freshman and sophomore years and remained average or above-average, her failure to achieve even higher grades does not establish the existence of a disability."); *A.J. v. Bd. of Educ.*, 679 F. Supp. 2d 299, 311 (E.D.N.Y. 2010) (concluding that a student's Asperger's syndrome did not adversely affect his educational performance because he was "performing at average to above average levels in the classroom and was progressing academically").

Plaintiffs rely on the decision in the Southern District of New York, *M.M.*, 26 F. Supp. 3d at 255-59, where the court determined that the administrative tribunal erred by concluding that the student was not disabled because her grades were not adversely

affected. The facts of that case, however, are markedly different. N.S.'s sole recognized disability at issue in this appeal is anxiety, whereas the student in *M.M.* suffered from multiple issues that prevented her from functioning at even a fundamental level. She had a history of eating disorders and suicide attempts. *Id.* at 253. She suffered from anxiety, body image issues, and harmed herself by cutting. *Id.* at 256. She was absent for weeks at a time and could not complete her last year of school. *Id.* at 256-57. While she normally received good grades, they began to decline at her public institution. *Id.* at 257. In reaching its conclusion, the district court found that the administrative tribunal improperly focused on the student's grades "without considering the more fundamental question of whether . . . [she] could even attend school" due to her history of suicide attempts, anxiety, body image issues, cutting, and an eating disorder. *Id.* at 256.[7]

Plaintiffs seek to tie *M.M.* to Renken's testimony, in which she stated (i) N.S.'s history teacher reported that his "absenteeism was a big problem for him" and it took him more than a month to make up a test (8/25/17 Tr. at 150:12-20); (ii) his English teacher stated he had not turned in a majority of his work and was falling behind (*id.* at

---

[7] Plaintiffs also cite OSEP Policy Letter, 17 IDELR 54 (Sept. 14, 1990) and OSEP Policy Letter, 48 IDELR 77 (Mar. 8, 2007), as support for their argument that the ALJ erred by focusing on N.S.'s academic performance. These letters merely make the non-controversial statement that education is a broader concept than academics, and that determining whether a child's disability affects educational performance must be done on a case-by-case basis.

150:24-151:2); and (iii) his Spanish teacher reported him missing assignments (*id.* at 152:7-9).

Plaintiffs' reliance on *M.M.* and Renken's testimony presumes that N.S.'s anxiety was the root of his absenteeism.[8] The facts as found by the ALJ, to which this Court must give due weight, show the contrary. From six to tenth grade, N.S. did not have a record of excessive absenteeism (R-12; J-2; J-7; J-12; J-19) and he complied with the regulatory mandated 90% attendance rate required for school districts.[9] During this period, N.S. excelled academically achieving nearly all A's and B's. (R-12; J-2; J-7; J-12; J-19.) Renken, whose observations the ALJ determined were entitled to "some weight," explained in her psychological assessment of N.S.—completed shortly before he stopped attending school—that (i) he did not exhibit inappropriate behaviors in school (J-25 at 148); (ii) none of his teachers believed he appeared anxious in classrooms (*id.* at 149-50); and (iii) he had appropriate interactions with his peers (*id.* at 156). Critically, it was only after N.S. could no longer be compelled to attend school that his absenteeism

---

[8] In addition, plaintiffs' point to testimony by Renken that they claim demonstrates N.S.'s anxiety prevented him from attending school and negatively impacted his educational performance. Renken, however, merely answered "[y]es" to the question on cross examination that "[y]our testimony states that N.S.'s absenteeism negatively impacted his educational performance. True?" (8/25/17 Tr. at 147:4-6.) Renken expressed no opinion whether N.S.'s absenteeism was involuntary or attributable to his anxiety.

[9] N.J.A.C. 6A:32-12.1(a) provides that "[t]he average daily attendance rate for each school district shall average 90 percent or higher as calculated for the three years prior to the school year in which the school district is monitored."

became problem. Indeed, in her prepared direct testimony, which the ALJ credited, McGovern stated that "[i]t did not appear to me that N.S. was unable to attend school. Rather, it appeared he was unwilling." (McGovern Direct ¶ 78.) Accordingly, the Court finds no error in the ALJ's decision that N.S.'s disability did not adversely affect his educational performance.

### 2. The ALJ's Finding that N.S. Did Not Require Specially Designed Instruction Was Not Error

Plaintiffs maintain that by relying on N.S.'s academic ability, the ALJ erred in applying the third factor of the N.J.A.C. 6A:14-3.5(c) test by "limiting the definition of special education to specially designed instruction." (Moving Br. at 11.) They argue that the ALJ should not only have considered whether N.S. required a change in curriculum but also whether he needed a change in learning environment. The District responds that N.S. did not require specially designed instruction as evidenced by his performance in higher level classes, which plaintiffs waived him into, and his standardized test results.

Special education in the third prong is defined as "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability," and includes (a) "instruction conducted in the classroom, in the home, in hospitals and institutions,

and in other settings"; and (b) "instruction in physical education."  20 U.S.C. §

1401(29).[10] "Specially designed instruction" is, in turn, defined as follows:

> Specially designed instruction means adapting, as appropriate to the needs
> of an eligible child under this part, the content, methodology, or delivery
> of instruction—(i) To address the unique needs of the child that result
> from the child's disability; and (ii) To ensure access of the child to the
> general curriculum, so that the child can meet the educational standards
> within the jurisdiction of the public agency that apply to all children.

34 C.F.R. § 300.39(b)(3). Plaintiffs correctly observe that specially designed instruction

is not limited to in-school modified curriculum and may also include a change in

learning environment. *See, e.g.*, *Indep. Sch. Dist. No. 284 v. A.C., by & through her Parent,*

*C.C.*, 258 F.3d 769, 771, 777 (8th Cir. 2001) (finding that residential placement was

appropriate given the student's severe and pervasive in-school and out-of-school

behavioral problems); *Bd. of Educ. of Montgomery Cnty. v. S.G.*, No. 2005-0323, 2006 WL

544529, at *15 (D. Md. Mar. 6, 2006) (affirming the ALJ's decision that the student

required special education which was supported by "[t]estimony from multiple experts

and the discharge summary from [a doctor that] show[ed] that in order to learn S.G.

requires instruction delivered to her in a therapeutic environment"), *aff'd*, 230 F. App'x

330 (4th Cir. 2007).

Plaintiffs' argument that N.S. required a change in his learning environment—

i.e. a therapeutic residential placement—is inextricably tied to their position that N.S.'s

---

[10] N.J.A.C. 6A:14-1.3 states that "'[s]pecial education' is defined in accordance with the
definition of the term set forth in IDEA and its implementing regulations, as amended
and supplemented."

anxiety caused his absenteeism and hence his ability to access the District's general curriculum. The evidence does not point that way for all of the above stated reasons, which includes McGovern's testimony that his absenteeism was voluntary.

Consistent with that evidence, the ALJ properly applied the third prong of N.J.A.C. 6A:14-3.5(c), and tellingly observed:

> That petitioners consistently chose to waive N.S. into higher level classes demonstrates that they do not believe he requires adapted content to access the curriculum. N.S.'s above-average performance on his report cards and on standardized testing reveal that he did not require any adaptations in methodology or delivery of instruction to meet the general education standards for all Randolph students.

(ALJ Op. at 53.) On that basis, the ALJ concluded that N.S. did not require specially designed instruction under the IDEA.

In sum, giving "due weight" to the ALJ's findings of fact, the Court finds that the administrative record supports her conclusion that N.S. did not require specially designed instruction as contemplated by N.J.A.C. 6A:14-3.5(c).[11]

---

[11] Plaintiffs also argue that the ALJ's decision was erroneous because the District failed its Child Find obligation under the IDEA by (i) not locating and identifying N.S. in all areas of suspected disability, (ii) failing to appropriately evaluate N.S., (iii) not providing plaintiffs meaningful input in the decision-making process, and (iv) not considering evaluations of N.S. provided by plaintiffs. Because N.S. is not eligible for special education under the IDEA, the Court need not address whether the District satisfied its Child Find obligations under the IDEA. *See* D.*G. v. Flour Bluff Indep. Sch. Dist.,* 481 F. App'x 887, 891 (5th Cir. 2012) (rejecting the argument that a school district's "failure to evaluate [a student] for special education prior to November 2009, his tenth-grade year, was a statutory violation for which he should recover, regardless of whether he ultimately was eligible for special education"); *M.M. v. Los Alamitos Unified Sch. Dist.,* No. 18-00088, 2018 WL 5914243, at *4 (C.D. Cal. June 4, 2018) (finding "[un]convincing" the argument that "Child Find is a duty of the student's school district

Notwithstanding, the District did have a Child Find obligation under Section 504 because it recognized that N.S. is disabled as defined by that statute. The Court agrees with the ALJ's determination that the District met those obligation by providing N.S. with the accommodations in his successive 504 Plans. (*see* J-3; J-4; J-6; J-9; J-10; J-18; J-23; J-29; J-31; *see also supra* at 3-4, 7).

The ALJ went further and found that "[e]ven if I concluded that N.S. was educationally impacted by his disability and entitled to FAPE through a comprehensive IEP rather than with 504 accommodations, I would not find" that plaintiffs were entitled to reimbursement for his placement at Waypoint. (ALJ Op. at 55.) The Court reviews this finding.

### E.  Plaintiffs are Not Entitled to Reimbursement

Under the IDEA, a court may require a school district to reimburse the parents for the cost of enrollment in a private institution if the court determines that the school district "had not made a free appropriate public education available to the child in a timely manner prior to that enrollment." 20 U.S.C. § 1412(a)(10)(C)(ii). By contrast, a school district is not required to pay for reimbursement if it made a FAPE available, and the parents nevertheless "elec[t] to enroll the student in a nonpublic school, an early

---

even for students not currently eligible for special education" (citation and internal quotation marks omitted)); *Dubrow v. Cobb Cnty. Sch. Dist.*, No. 14-00659, 2017 WL 5203047, at *12 (N.D. Ga. Feb. 28, 2017) ("Because this Court concludes that Connor did not need special education due to his disability, the District is not liable for failing to locate, identify, or evaluate Connor, nor was it required to provide him with a FAPE pursuant to the IDEA."), *aff'd*, 887 F.3d 1182 (11th Cir. 2018).

childhood program, or an approved private school for students with disabilities." N.J.A.C. 6A:14-2.10(a). In addition, if reimbursement is appropriate, it may still be reduced or denied if (i) the parents did not inform the IEP team at the most recent IEP meeting they attended prior to the student's removal that they were rejecting the proposed IEP; (ii) "the parents did not give written notice to the district board of education of their concerns or intent to enroll their child in a nonpublic school" 10 business days prior to the removal; (iii) "[i]f prior to the parents' removal of the student from the public school, the district proposed a reevaluation of the student and provided notice according to N.J.A.C. 6A:14–2.3 (g) and (h) but the parents did not make the student available for such evaluation"; or (iv) there is a judicial finding of unreasonableness regarding the actions taken by the parents. N.J.A.C. 6A:14-2.10(c).

Parents who "'unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk.'" *Florence Cnty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 15 (1993) (quoting of *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 373–74 (1985)). "They are entitled to reimbursement only if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act." *Id.* "A placement qualifies when it is 'appropriate,' in that it 'provides "significant learning" and confers "meaningful benefit."'" *H.L. v. Downingtown Area Sch. Dist.*, 624 F. App'x 64, 70 (3d Cir. 2015) (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 276 (3d Cir. 2007)). The

parents must also demonstrate they have acted in good faith. *T.H. ex rel. A.H. v. Clinton Twp. Bd. of Educ.*, No. 05-3709, 2006 WL 1128713, at *2 (D.N.J. Apr. 25, 2006) (Chesler, J.).

The evidence adduced demonstrates that Waypoint did not offer N.S. educational support related to his anxiety disorder. As an initial matter, N.S.'s consistently good academic performance from sixth through tenth grades shows that Waypoint was not required for him to achieve any "significant learning" benefit. *See H.L.*, 624 F. App'x at 70 (citation and internal quotation marks omitted). Indeed, there is evidence that plaintiffs decided to place him at Waypoint prior to the District's eligibility meeting to reduce stress and chaos in the home. (*See* J-16 at 4 (stating that N.S. told O'Keefe in 2016 that plaintiffs "wanted [him] to stay home and help them look for a place to help with my anxiety"); D.S. Cert. ¶ 116 (indicating that plaintiffs met with Pam Bard, an educational consultant, around November 2016); 10/10/17 Tr. at 76:21-25 (D.S. testifying that Pam Bard sent plaintiffs documentation about Waypoint on December 16, 2016).) Further, Curioni, the District's Director of Special Services, whom the ALJ qualified as an expert in eligibility and programming for special education (ALJ Op. at 15), stated in his prepared direct testimony that he went to Waypoint to evaluate its appropriateness and testified that he "did not observe any therapeutic support being delivered to N.S" (R-7 ¶ 69). He said "N.S. exhibited difficulty completing his work in [] math class" (*id.* ¶ 72) and that N.S. was "stammering using involuntary repetitions and prolongation of sounds and syllables" (*id.* ¶ 76).

According to Curioni, "N.S. was not provided special education in any of the classes [he] observed." (*Id.* ¶ 80.) He believed that "N.S. is functioning at a lower level at Waypoint than he had been when attending Randolph High School." (*Id.* ¶ 82.)

The ALJ properly noted that N.S.'s unilateral placement at Waypoint was akin to the student's placement in *Munir v. Pottsville Area School District*, 723 F.3d 423 (3d Cir. 2013). In *Munir*, the Third Circuit determined that the parents were not entitled to reimbursement for the placement of their teenage son in a residential facility because a medical emergency, and not any educational reasons, prompted the placement. *Id.* at 433. The court emphasized, as is the case here, that before the placement the child "was an above-average student . . . who had no serious problem with attendance and socialized well with other students." *Id.* at 433-34. The ALJ's finding that plaintiffs are not entitled to reimbursement of the costs of their unilateral placement of N.S. at Waypoint is well supported by the evidentiary record.[12]

## F.    The ALJ's Evidentiary Rulings Were Not Erroneous

### 1.    The ALJ's Decision to Qualify Renken as an Expert is Entitled to Deference

Plaintiffs maintain that the ALJ erroneously qualified Renken as expert. At the time she testified, Renken had been a school psychologist for the District for just under

---

[12] The District contends that plaintiffs are also not entitled to reimbursement because they did not cooperate with it. The Court need not reach that issue having found that N.S. is not eligible for special education under the IDEA and that Waypoint does not confer any meaningful learning benefit.

one year.  (8/15/17 Tr. at 101:14-16.)  Renken began employment with the District in September 2016, having received her Education Specialist Degree in school psychology in May 2016 and a Master of Education in 2014.  (*Id.* at 101:11-13, 101:17-20; R-2.)  As part of her training, Renken had completed 35 psychoeducational assessments.  (*Id.* at 102:4-7.)  Based on the foregoing, the ALJ qualified Renken as an expert.  After plaintiffs objected to Renken's qualifications because of a lack of presentations and published papers on her resume, the ALJ noted that plaintiffs' objections would go to the weight of her testimony but not its admissibility.  (ALJ Op. at 7 n.4.)

Relatedly, plaintiffs contend that the ALJ afforded Renken's testimony too much weight based upon how she performed on cross-examination.  What plaintiffs have offered as "admissions" are Renken's acknowledgement of certain home truths (education includes student's emotional success, grades are only one indication of success, and absenteeism negatively impacts educational performance).  She agreed with certain aspects of O'Keefe's evaluation, and she stated she had reviewed Martinson's report prior to the CST eligibility meeting.  None of this significantly weakens the basis for Renken's conclusions or the weight that the ALJ afforded her testimony.

## 2. The ALJ Gave Proper Weight to Curioni's Testimony

Plaintiffs argue that the ALJ erred by not giving lesser weight to the testimony of Curioni because he was not a disinterested party in that he was "devot[ed] to cutting the number of out of district placements by 40% between 2015 and 2017."  (Moving Br. at 44.)

Plaintiffs' mischaracterize Curioni's testimony. Curioni did not testify that he "cut" out-of-district placements by classifying fewer students; rather, he reduced out-of-district placements by providing more services in district for those students. Specifically, he explained as follows:

> For example, that last two years, I've added therapy rooms to our Middle School and High School based on what I've described as an epidemic of mental health issues. I created an ABA Program at our Middle school Model, Seventh and Eighth Grade, so we no longer have resource there. Created ABA Programs at the Elementary level, so we're really able to support our students, I just – we brought a house next door to the High School, so now we're able to support our 18 to 21 students, so several new programs have been brought to Randolph in the last couple years.

(9/11/17 Tr. at 90:5-16.) Under the appropriate standard, the Court must accept the ALJ's credibility determinations absent non-testimonial, extrinsic evidence in the record that would justify a contrary conclusion. *Shore Reg'l High Sch.*, 381 F.3d at 199. There is nothing to suggest from this record that her credibility findings regarding Curioni are erroneous.

### 3. The ALJ Properly Considered the Opinions of Plaintiffs' Experts

The ALJ determined the plaintiffs' experts, DaSilva and Martinson, gleaned the information that formed the foundation of their opinions largely from the second-hand accounts of D.S. (*See* ALJ Op. at 34.) In his psychiatric evaluation, Martinson stated he relied on documents provided by D.S., and interviews of D.S. and N.S. (P-22 at 318, 327-37.) Indeed, a majority of his evaluation is devoted to quoting e-mails in which D.S. made uncorroborated claims that N.S. was experiencing school-related anxiety.

(*Id.* at 320-26; *see also* 9/13/17 Tr. at 45:9-11, 45:14-16 (Martinson admitting that he did not observe N.S. in school or even attempt to speak to N.S.'s teachers).) Likewise, DaSilva admitted that he collected the information for his evaluation from interviews with N.S. and plaintiffs and from records he reviewed.[13] (11/14/17 Tr. at 35:4-6.) The Court finds that the ALJ committed no error regarding the weight she afforded Martinson's and DaSilva's testimony and reports.[14]

## IV. Conclusion

For the above stated reasons, the administrative record supports the findings and conclusions of the ALJ's July 16, 2018 decision, and it is affirmed. The Court enters judgment in favor of the District. An appropriate order will be entered.

/s/ Katharine S. Hayden

Dated: September 30, 2019                    Katharine S. Hayden, U.S.D.J.

---

[13] By contrast, Renken observed N.S. in school and received input from his teachers for her evaluation.

[14] Plaintiffs also fault the ALJ for allegedly considering programs the District could have offered to N.S. but did not. The Court's review of the ALJ's decision and the administrative record finds no basis to conclude that the ALJ considered any program that the District could have offered N.S. but did not.